UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:  CASE NO.

**MIRANDA MONLIETHA BROOKS**  07-11608

DEBTOR

**TOWER CREDIT, INC.**  ADV. NO.

PLAINTIFF  **08-1002**

V.

**MIRANDA MONLIETHA BROOKS**

DEFENDANT

## MEMORANDUM OPINION

Tower Credit, Inc. ("Tower") sued for a determination that its claim against debtor Miranda Brooks was not dischargeable under 11 U.S.C. §523(a)(2)(A). For reasons given in this memorandum opinion, Tower's complaint will be dismissed.

## FACTS

This lawsuit arises from the debtor's financing her purchase of a 1997 Dodge Intrepid from Dixieland Sports & Imports.[1] Once Ms. Brooks decided to buy the car, on March 31, 2003 a Dixieland sales person faxed Tower information concerning Brooks with an inquiry about financing the vehicle.[2] Though Brooks does not dispute that she signed the Dixieland credit application, she denied completing the forms herself, testifying that she had given *some* of the

---

[1] The documentary evidence reflects that debtor wanted a loan to buy a 1994 Mazda 626. Brooks actually bought a 1997 Dodge Intrepid and denied ever telling Tower she was buying a Mazda.

[2] Dixieland Sports & Imports Credit Application (Tower Exhibit 1).

information on the form to the Dixieland sales representative, who apparently completed the application. Brooks and a Dixieland representative later went to Tower's offices, where on April 4, 2003 Brooks signed a Tower credit application to borrow money to buy the car.[3] That application reflected that Brooks's net monthly income was $1600 and that she also received $450 in child support each month. The application originally listed her employer as Popeye's Fried Chicken, but that information was lined through and Burger King was written in.[4]

Brooks testified that she did not complete the Tower credit application and specifically took issue with some of the information on it. However, she admitted that she signed the application on a line below a statement warranting that all information on the application was true.

Tower obtained a copy of Brooks's paycheck stub—the first she had received from Burger King—before it loaned her the funds to buy the car.[5] The check stub reflected that the debtor worked 49.45 hours during the pay period, for which she was paid $243.60.[6] Brooks thus took home about $4.93 per hour for each hour she worked.

Brooks borrowed more money from Tower a few months later to pay for repairs to the car she had bought from Dixieland.[7] The debtor's application for that loan[8] listed the same employer and net income as the completed Tower application for the auto loan.

---

[3] April 4, 2003 Tower credit application (Tower Exhibit 2).

[4] The debtor testified that she had never worked at Popeye's and never told anyone that she worked at Popeye's. Tower's president acknowledged writing that the debtor worked at Popeye's, which he learned from someone at Dixieland after calling to obtain information to complete a blank on the application.

[5] Paycheck stub (Tower Exhibit 3).

[6] The check stub reflects deductions for Medicaid, Social Security and Louisiana income taxes.

[7] September 4, 2003 Combination Promissory Note, Truth-in-Lending Disclosure and Security Agreement (Tower Exhibit 6).

[8] September 4, 2003 Tower credit application (Tower Exhibit 5).

Some time after Tower made the second loan, Brooks defaulted on the obligation. Tower sued Brooks and obtained a state court default judgment against her.[9]

Brooks filed chapter 7 on November 13, 2007. Tower timely filed its complaint to determine the dischargeability of Brooks's debt to it.

## APPLICABLE LAW

Tower's complaint alleges the debtor's actions bar the discharge of her debt to Tower under 11 U.S.C. §523(a)(2)(A), which excepts from discharge a debt—

>for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
>>(A)  false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's . . . financial condition . . . .*

(emphasis added). However, the debtor's allegedly false representations all were made in connection with her applications to borrow money from Tower. Thus, section 523(a)(2)(A) is not applicable.

The applicable statute is 11 U.S.C. §523(a)(2)(B), which excepts from discharge a debt—

>for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by use of a statement in writing—
>
>>(i)   that is materially false;
>>
>>(ii)  respecting the debtor's or an insider's financial condition;
>>
>>(iii) on which the creditor to whom the debtor is liable for such . . . credit reasonably relied; and

---

[9] December 8, 2004 Judgment in "Tower Credit, Inc. v. Miranda Brooks," No. 0410-08955, Div C., Baton Rouge City Court, Baton Rouge, Louisiana (Tower Exhibit 6).

- 3 -

        (iv)    that the debtor caused to be made or published with intent to deceive.[10]

Rule 7015(b) of the Federal Rules of Bankruptcy Procedure allows the amendment of pleadings to conform to the evidence if issues not raised in the original pleadings are raised at trial by express or implied consent of the parties. Both parties offered evidence as relevant to a claim under section 523(a)(2)(B) as one under section 523(a)(2)(A). Thus, the evidence amended Tower's complaint to include a cause of action under 11 U.S.C. §523(a)(2)(B).[11]

## DISCUSSION

### A.    Tower Did Not Reasonably Rely on Brooks's False Statements

Tower proved that Brooks's credit applications contained materially false written statements. A statement is materially false if it "'paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.'"[12] Brooks knowingly misrepresented her monthly income to obtain a loan from Tower to buy a car. Though the debtor claimed not to know how her loan applications recited that she had $1600 monthly net income, by signing the applications warranting that she took home $1600 each month, she adopted the false information for the purpose of 11 U.S.C. §523(a)(2)(B).[13] Nothing in the record supports a finding or conclusion that she should be relieved of the consequences of her false statements.

---

[10] *Matter of Norris*, 70 F.3d 27, 29 (5th Cir. 1995).

[11] *See Matter of Beauboeuf*, 966 F.2d 174, 177 (5th Cir. 1992) (citations omitted) (implying consent of the parties to trial of issues not raised in the pleadings where the parties had a "fair opportunity to defend" with respect to the amended issues and where additional evidence could have been presented had the amendment been made earlier).

[12] *Norris*, 70 F.3d at 30, quoting *In re Jordan*, 927 F.2d 221, 224 (5th Cir. 1991).

[13] *In re Oh*, 278 B.R. 844, 860 (Bankr. C.D. Cal. 2002) ("[p]referring to know as little as possible about a transaction in which he really did not want to participate, the Debtor simply signed whatever was put in front of him without any regard for its truth or falsity. A debtor cannot escape liability under section 523(a)(2)(B) by firmly putting his head in the sand and later claiming not to have known of the falsity of representations that were made on his behalf while his head was covered"). *Cadle Co. v. Orsini*, 2007 WL 1006919 at *5 (Bankr. E.D. Tex. 2007)

Nevertheless, Brooks's false statements do not entitle Tower to relief because Tower failed to prove it reasonably relied on Brooks's misrepresentations.

For a declaration of nondischargeability, section 523(a)(2)(B) requires proof that the creditor reasonably relied on the debtor's false statements.  "The reasonableness of a creditor's reliance . . . should be judged in light of the totality of the circumstances.  The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations."[14]

Brooks gave Tower her Burger King paycheck to confirm her employment when she applied for the first loan.  Tower should have realized from the check stub that, earning a net hourly wage of $4.93, Brooks could not possibly have taken home the monthly income reflected on her credit applications.  Put another way, Brooks would have had to work nearly 325 hours each month – essentially 10 hours every day of the month – to have a net monthly income of $1600.  This fact alone should have been a "red flag" alerting Tower to the inaccuracy of Brooks's application.  Tower's reliance was not reasonable within the meaning of *Coston* and *Norris*.[15]

---

(citation omitted) ("[a]s long as the written statement is written, signed, adopted or used by the debtor, the basic precondition concerning the writing requirement to the non-dischargeability complaint under section 523(a)(2)(B) is met").

[14] *Matter of Coston*, 991 F.2d 257, 261 (5th Cir. 1993).

[15] Nor did Tower satisfy section 523(a)(2)(A)'s requirement of proof of its *justifiable* reliance on the debtor's misrepresentations.  Justifiable reliance is a less rigorous standard than reasonable reliance; it is gauged by "'an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case.'" *In re Vann*, 67 F.3d 277, 288 (quoting *Prosser & Keeton on Torts* at 751).  "'It is only where, under the circumstances, the facts should be

### B. The Evidence Did Not Support Tower's Entitlement to Relief on Other Grounds

The evidence did not support Tower's other allegations.[16] Specifically, no evidence supported Tower's claim that Brooks colluded with the car dealer to obtain the loan from Tower by misrepresenting the history of the debtor's payments on an earlier car loan for the purchase of a Mazda 626. Stephen Binning, Tower's president, testified without any corroboration to his belief that Kevin Reeves of Dixieland had an interest in the note for the purchase of that vehicle, which was being serviced by Wells Fargo with an agreement to put the note back to Dixieland if the debtor defaulted. However, Binning admitted that neither Dixieland nor Wells Fargo were listed as creditors on the debtor's credit report, and explained that this was not surprising because Dixieland does not report its loans and Wells Fargo supposedly only serviced the debtor's loan.

Binning stated that he based his "reasonable belief" that collusion took place on the inconsistency between the representation on the Dixieland credit application (which the debtor signed) that she had paid Dixieland and Wells Fargo perfectly for 18 months, and the debtor's own statement at the meeting of creditors that she had not financed the Mazda.[17] However, Tower did not call a representative of Dixieland to explain in general its process of financing car loans using Wells Fargo or to verify the facts concerning the debtor's loan from Dixieland. In fact, Ms. Brooks offered the only testimony concerning her prior vehicle purchase, saying that she acquired the car on "lease/purchase" agreement from another Baton Rouge dealer whose name she could not recall.

---

apparent to one of the plaintiff's knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" *Id*. at 283 (quoting *Prosser & Keeton on Torts* at 752).

[16] Complaint, ¶6.

[17] Transcript of December 13, 2007 §341 meeting, p. 27, lines 11-25, p. 28, lines 1-3 (Exhibit T-8).

In summary, the evidence concerning Dixieland's handling of the debtor's prior obligation was inconclusive.

Next, Tower alleged that it would not have made the loan had it not believed that the debtor had a "perfect" payment history on the earlier car loan.[18] However, Mr. Binning admitted on examination by the court that a history of missed or late payments on a loan would not, by itself, cause Tower to forego making a loan. Tower's argument that it would not have made the loan absent proof that its customer had a perfect record of payments on earlier obligations is not plausible or credible.

## CONCLUSION

Tower Credit did not sustain its burden of proving that Miranda Brooks's debt to it was nondischargeable. Accordingly, the court will dismiss Tower's complaint.

Baton Rouge, Louisiana, August 15, 2008.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

---

[18] See footnote 16, *supra*.